**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

    **Plaintiff,**

              **v.**

ISRAEL RIVERA-RIVERA,

    **Defendant.**

**Criminal Nos.** 07-018 (FAB)
07-019 (FAB)
07-020 (FAB)

**OPINION AND ORDER**

## I.  INTRODUCTION

In Criminal Cases 07-018 (FAB), 07-019 (FAB) and 07-020 (FAB), defendant Israel Rivera-Rivera ("Rivera") stands indicted on three counts of conspiracy to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841(a)(1) and 846, as well as three counts of conspiracy to import narcotics, in violation of 21 U.S.C. §§ 963 and 952.  (Docket No. 2 in all three cases.)  The issue before the Court is whether defendant Rivera is "presently [sic] suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(d).  The Court must make this finding by a preponderance of the evidence.  Id. Having considered the testimony and exhibits presented at the various sessions of the competency hearing concerning defendant Rivera's mental status, (Docket Nos. 141, 157, 220, 221, 222, 223,

302, 305, & 339), and having reviewed both parties' simultaneous proposed findings of fact and conclusions of law, (Docket Nos. 352 & 353), the Court finds defendant Rivera **COMPETENT TO STAND TRIAL.**

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Defendant Rivera's Arraignments

After defendant Rivera was arrested on March 16, 2010, U.S. Probation Officer Nancy Mendez conducted a pre-trial interview and subsequently prepared a pre-trial services report. (See Docket No. 305 at p. 4; Docket No. 207 at Exhibit No. 13.) Officer Mendez testified that defendant Rivera did not act strangely during the interview, was coherent, answered all of her questions in a coherent manner, and appeared to understand the process of what was occurring. (Docket No. 305 at pp. 9-10.) At the beginning of the interview, Officer Mendez told defendant Rivera that he had a right to an attorney, but he elected to sign a release form indicating that he did not want an attorney to be present for his interview. (Id. at pp.10-11; Docket No. 207 at Exhibit No. 14.)

During the interview, defendant Rivera was able to communicate to Officer Mendez extensive personal information, including his home address and telephone number; the number and ages of his children; his girlfriend's name; the amount of time they had been seeing each other and how frequently she stayed with him; his prior work experience; the duration of various jobs he

held; the status of his U.S. passport; the model, year, cash value and registration of his car; the value of his home; the value remaining on his mortgage; the amount of income he received from social security benefits and food stamps; as well as his monthly expenses for utilities, his cell phone, and child support. (Docket No. 305 at pp. 13-30; Docket No. 207 at Exhibit No. 13.)  In addition, defendant Rivera provided information about his 2006 arrest in the Dominican Republic for drug charges, and stated that he had traveled to the Dominican Republic approximately five times before his arrest.  (Docket No. 207 at Exhibit No. 13.)

Defendant Rivera also disclosed to Officer Mendez a history of mental illness since high school.  (Docket No. 207 at Exhibit No. 13; Docket No. 305 at p. 31.)  He explained that he suffers from anxiety, schizophrenia, and hallucinations, and he was able to name the doctors who treat him.  (Docket No. 305 at p. 33.) He also listed the type and daily dosage of the medication he received.  Id. at p. 36.  In addition, defendant Rivera revealed that he had attempted suicide several times by drinking poison and hanging himself both at home and while he was imprisoned in a jail called La Victoria in the Dominican Republic.  (Id. at pp. 33-34; Docket No. 207 at Exhibit No. 13.)  He also reported hearing voices that control and manipulate him.  (Docket No. 305 at pp. 37; Docket No. 207 at Exhibit No. 13.)

On March 19, 2010—three days after his interview with Officer Mendez—defendant Rivera appeared before Magistrate Judge Bruce McGiverin for the first of his arraignments.[1]  In addition to informing the magistrate judge of his name, age, and highest level of education at the arraignment, defendant Rivera indicated that he understood the proceedings, that he received a copy of the indictment, and that he had discussed the nature of the charges with his attorney.  (Docket No. 207 at Exhibit 5.)  Upon his return to the Metropolitan Detention Center in Guaynabo, Puerto Rico ("MDC Guaynabo") just hours after the arraignment, however, defendant Rivera acted disoriented in time and place, constantly moved his arms and legs, and told MDC Guaynabo staff that he did not know his own name, that he heard voices and feels another person with him, and that he was at three places:  court, home, and jail.  Id. at Exhibit Nos. 11-M & 11-N.  He also stated that he had "a lot of pain," he became aggressive and angry, and he asked if he was going to be stuck with a needle because he had experienced such injections while incarcerated in the Dominican Republic.  Id.

At what was to be his second arraignment, defendant Rivera appeared before Magistrate Judge Camille Velez-Rive on April 9, 2010.  Because defendant Rivera had difficulty answering

---

[1] Defendant Rivera was arraigned in Criminal No. 07-020 on March 19, 2010, and in Criminal Nos. 07-018 and 07-019 on April 9, 2010.

the questions posed to him, and because he appeared slightly disoriented, the magistrate judge noted that she was unwilling to find defendant Rivera competent to stand trial at that time. (Docket No. 207 at Exhibit 6; see also Criminal No. 07-019, at Docket No. 21.) The magistrate judge postponed the date of the arraignment until Dr. Carol Romey could issue a psychodiagnostic report as to defendant Rivera's mental status. Id.

**B.    Psycho-Diagnostic Testing of Defendant Rivera**

**1.    Dr. Carol Romey's Evaluation at MDC Guaynabo**

Dr. Romey evaluated defendant Rivera on May 10 and May 17, 2010 for a total of four hours, and issued a Psychodiagnostic Assessment Report on May 20, 2010. (Docket No. 206 at Exhibit TT.) In her report, Dr. Romey concluded that defendant Rivera "was not able to comprehend any component of the consent process," "was unable to perform psychological tests," and "showed signs of an active psychotic state." Id. at pp. 2-3. Dr. Romey found defendant Rivera to be disoriented in time, situation and place; confused as to whether he was in prison or in a hospital; fearful and sad; and to have exhibited traumatic responses like crying, blockage, and shaking to any discussion of subjects like his children and incarceration in the Dominican Republic. Id. at p. 3. Defendant Rivera also reportedly suffered hallucinations in the form of voices during the interviews, and he

stated that the voices have been with him since early childhood. Id. at pp. 2-3. The voices allegedly tell defendant Rivera when he can eat and what information he can reveal in the interviews, and they direct him to go for walks and to watch his cellmate while he sleeps. Id. By consulting documents and speaking to defendant Rivera and his parents, Dr. Romey compiled a clinical history report that includes many medical diagnoses of a range of mental disorders, including five diagnoses of depressive disorders, nineteen diagnoses of bipolar disorders, five diagnoses of anxiety disorders, five diagnoses of psychotic disorders, seven diagnoses of substance dependence disorders, nine diagnoses of impulse control disorders, and one diagnosis of a personality disorder. Id. at Exhibit VV.

        Dr. Romey diagnosed defendant Rivera with, most notably, "bipolar disorder, posttraumatic stress disorder, psychosocial and environmental problems, and problems related to interaction with the legal system." (Docket No. 207 at Exhibit TT at pp. 5-6.) She concluded that defendant Rivera "is unable to fulfill minimal clinical criteria for competence to stand trial," and recommended that defendant Rivera be considered for bail so that he could continue a psychiatric treatment plan in a familiar and safe home environment. Id. at pp. 6-7. "[I]t is expected that [defendant] Rivera will be able to stabilize his mental condition.

Upon stabilization, [defendant] Rivera may be able to recover sufficient cognitive abilities to be able to participate in his criminal defense." <u>Id.</u> at p. 7.

### 2.  Dr. Jorge Luis' Evaluation at FMC Miami

In response to Dr. Romey's report, the government informed the Court that "the United States has evidence in its possession that the defendant [Rivera] is malingering"[2] and requested that defendant Rivera be sent to a Federal Medical Center in Miami, Florida ("FMC Miami") to be evaluated for mental competency pursuant to 18 U.S.C. § 4241. (Docket No. 35 at p. 2.) The Court granted the government's request and consequently ordered defendant Rivera to be sent to FMC Miami, where a forensic psychologist, Dr. Jorge Luis, conducted an evaluation from June 21, 2010 through July 21, 2010. (Docket No. 46.) Dr. Luis conducted three hours of clinical interviews with defendant Rivera, spoke to various members of the FMC Miami Psychology Services staff about their daily clinical contacts with defendant Rivera, consulted available legal documentation pertaining to defendant Rivera's

---

[2] As discussed in several expert witness' testimony and reports at defendant Rivera's mental competency hearings, the medical term "malingering" is defined as "the intentional misrepresentation or exaggeration of physical or psychological symptoms, for gains such as receiving diminished legal ramifications." (<u>See, e.g.</u>, Docket No. 164-1 at p. 4.)

case, and ultimately issued a Forensic Report on August 11, 2010. (Docket No. 77-2 at pp. 1-2.)

Dr. Luis informed defendant Rivera that the purpose of the examinations was to determine whether he is competent to stand trial and that anything he discussed might be relayed to the Court.   (Docket No. 77-2 at pp. 1-2.)   Dr. Luis noted that defendant Rivera did not appear to understand the information provided.   Id.   The report indicated that defendant Rivera exhibited organized and coherent thought processes, he was semi-cooperative and attentive throughout the evaluations, he did not demonstrate any gross neuropathological body movements, he sat in an erect yet relaxed posture during his interviews, he wore an inmate's uniform as instructed, and he walked with a normal gate. (Docket No. 77-2 at p. 5.)

Over the course of his evaluations, however, defendant Rivera "ultimately was unable or unwilling to complete any psychological measures." (Docket No. 77-2 at p. 2.) Dr. Luis found defendant Rivera's memory to be difficult to assess and his behavior erratic.  Defendant Rivera was initially placed on Suicide Watch due to erratic behavior, lack of cooperation, and statements suggesting suicidality; he exhibited inadequate attention and concentration skills; he focused on issues of his choosing during his interviews—primarily, the abuse he allegedly suffered while

detained in La Victoria jail in the Dominican Republic; he was unable to provide relevant and accurate autobiographical information; and he was often unable or unwilling to respond to staff. Id. at pp. 2-5. Defendant Rivera exhibited odd behavior like kneeling in a crucifixion pose, stating that he had been tied in that position in the Dominican Republic jail and beaten; he urinated on himself; he reportedly experienced auditory and visual hallucinations and responded to internal stimuli; he was often depressed and tearful during clinical contacts; he refused to eat meals; he was malodorous; he had poor hygiene; and he was unable to respond to dichotomous response items ("yes" or "no" questions). Id. Dr. Luis concluded that defendant Rivera's symptoms best fit the criteria for Psychotic Disorder, Not Otherwise Specified ("NOS"), but noted that the difficulty in assessing defendant Rivera's current mental state prohibited the accurate appraisal of other conditions. Id. at p. 6.

In his initial report, Dr. Luis warned that the possibility of malingering, however, should be thoroughly assessed. "[I]t is possible that the defendant may be purposely engaging in these behaviors due to his perception that he might avoid entirely, or receive diminished repercussions, for his alleged criminal behavior." (Docket No. 77-2 at p. 6.) Dr. Luis therefore recommended either to find defendant Rivera incompetent to stand

trial, or to transfer defendant Rivera to a federal medical prison

to undergo a more comprehensive inpatient psychiatric assessment.

Id. at p. 7.

### 3.    Dr. Bryon Herbel's Evaluation at FMC Butner

### a.    Clinical Observations

Upon receiving Dr. Luis' recommendations, the

government filed a motion to request that defendant Rivera be

transferred to the Federal Medical Center in Butner, North Carolina

("FMC Butner") "to undergo more comprehensive inpatient psychiatric

assessment and treatment pursuant to 18 U.S.C. § 4241." (Criminal

No. 07-020, Docket No. 91 at p. 2.)  On September 1, 2010, the

Court granted the motion and ordered defendant Rivera to be

evaluated by a forensic psychiatrist or psychologist at FMC Butner,

"to determine if he is competent to stand trial and assist his

attorney in his defense," pursuant to 18 U.S.C. §§ 4241(c) and

(d).[3]  (Criminal No. 07-020, Docket No. 94).  At FMC Butner,

---

[3]  Defendant Rivera objected to the Court's order on
September 14, 2010, filing a motion to request a mental competency
hearing, pursuant to 18 U.S.C. § 4241(c).  (Criminal No. 07-018,
Docket No. 49.)  The Court denied defendant Rivera's motion on
September 15, 2010 and ordered defendant Rivera to be referred to
FMC Butner "for further evaluation" of his mental competency to
stand trial.  (Criminal No. 07-018, Docket No. 50.)  The Court
noted that once the evaluation concluded, defendant Rivera may
request a competency hearing.  Id.  On September 30, defendant
Rivera requested reconsideration of the Order.  (Criminal No. 07-
020, Docket No. 105.)  The Court denied the motion, ruling that a
competency hearing at that time was unnecessary, and that defendant
Rivera should remain in Butner "to continue his evaluation by the

Dr. Bryon Herbel evaluated defendant Rivera from October 13, 2010

---

[g]overnment." Id.  Defendant Rivera again objected on October 24, 2010 and requested that the Court inform the parties whether its order committing defendant Rivera to FMC Butner was made pursuant to 18 U.S.C. §4241 or § 4247.  (Criminal No. 07-018, Docket No. 60; Criminal No. 07-020, Docket No. 113.)

       In those objections, and in his memorandum before the Court, (Criminal No. 07-018, Docket No. 353), defendant Rivera argued that the Court did not follow the procedural requirements of 18 U.S.C. § 4241 because it sent defendant Rivera to FMC Butner before making an initial determination of his incompetence.  Defendant Rivera contends that (1) the Court was required to grant his initial motion to determine competency because "the parties (Dr. Romey and Dr. Luis) were in agreement that the defendant [Rivera] was mentally incompetent to proceed to trial," and (2) the Court erred in waiting to hold the competency hearing until after defendant Rivera returned from the four-month evaluation at FMC Butner. (Criminal No. 07-018, Docket No. 353 at p. 35.)

       The Court rejects defendant Rivera's arguments.  At a status conference on October 27, 2010, the Court requested that both parties stipulate to waiving a hearing pursuant to 18 U.S.C. § 4241(c) and instead allow defendant Rivera to remain at FMC Butner.  (See Criminal No. 07-020, Docket No. 119.)  The Court sought the stipulation so as to avoid transporting defendant Rivera back to Puerto Rico from FMC Butner, holding the hearing, and then re-sending defendant Rivera to FMC Butner for an evaluation pursuant to 18 U.S.C. § 4241(d)(1).  After counsel quarreled over defendant Rivera's mental condition, the parties ultimately agreed to the stipulation.  (See id.)  Defendant Rivera agreed to stipulate that "[p]ursuant to 18 U.S.C. § 4241(d)(1) the Attorney General shall hospitalize the defendant [Rivera] for a reasonable period of time not to exceed four months.  Defendant Rivera arrived at FMC Butner, North Carolina for such evaluation on October 13, 2010."  (Id. at p. 2.)  Shortly thereafter, on October 29, 2010 the Court entered an order authorizing treatment of defendant Rivera at FMC Butner, pursuant to 18 U.S.C. § 4241(d)(1).  (Criminal No. 07-018, Docket No. 66.)  Because the parties stipulated to waiving a mental competency hearing before committing defendant Rivera to further treatment at FMC Butner, the Court rejects defendant Rivera's arguments that it failed to follow the prescribed statutory procedures.

to February 16, 2011 by conducting individual interviews, a physical examination, and a computerized tomography brain scan of defendant Rivera.  (Docket No. 77-1 at p. 3.)  Dr. Herbel also consulted with members of the forensic team and correctional and mental health staff about their observations of defendant Rivera. Id.  On February 23, 2011, Dr. Herbel issued a Forensic Evaluation. Id. at p. 1.

Using a translator,[4] Dr. Herbel conducted several individual interviews with defendant Rivera.  (Docket No. 77-1 at p. 6.)  Throughout his evaluations, defendant Rivera appeared confused, made poor eye contact, appeared very anxious, cried, and sweated during medical assessments.  Id. at p. 11.  To Dr. Herbel, a notable feature of defendant Rivera's clinical presentation was his hyperhidrosis (the copious sweating of both hands), which worsened whenever he exhibited fear or anger.  Id. at p. 10.  The medication prescribed for this condition proved unsuccessful; as defendant Rivera continued to have excessive sweating in his hands.  Id.

Defendant Rivera reportedly became "very emotionally distraught" during the interviews, and he trembled and sobbed while discussing his memories of watching domestic violence

_____

[4] Because Dr. Herbel does not speak or read Spanish, all interviews of defendant Rivera were conducted with the assistance of a telephone or staff interpreter.  (Docket No. 77-1 at p. 3.)

occur in his home. Id. at p. 7. He claimed to have a constant imaginary friend, a spirit called Madrid Jack, who: incited defendant Rivera's father to brutalize his mother; made a pact with defendant Rivera that they would try to protect defendant Rivera's mother from his father's violence; guided defendant Rivera to engage in homosexual activities on a beach in order to please Madrid Jack; provided defendant Rivera with strength and confidence; and caused defendant Rivera to fear that Madrid Jack might provoke his father to resume brutalizing his mother if defendant Rivera ever tried to free himself of Madrid Jack. Id. at pp. 8–9.

Defendant Rivera told Dr. Herbel that he could not remember anything about his childhood "due to a long-standing problem with memory." (Docket No. 77-1 at pp. 11–12.) He appeared to be unable or unwilling to discuss the events that led up to his arrest in the Dominican Republic in 2006, id. at p. 7, but defendant Rivera could recall in detail having suffered brutal treatment in La Victoria jail. Id. at p. 9. He claimed to have been beaten and dragged through the hallway while in restraints; to have had a Haitian inmate who—also while in restraints—was beaten and killed by blows to the head; to have been splattered on his face with the Haitian inmate's blood; and to have received injections of antipsychotic medication to keep him calm. Id. He

also stated that if it weren't for his pact with Madrid Jack not to commit suicide, he would have killed himself because his life did not have meaning anymore:  "Those people in the Dominican Republic destroyed me.  If it wasn't for him, I would have hung myself." Id. at p. 15.

Dr. Herbel also conducted a telephone interview with defendant Rivera's mother and sister to gather information about defendant Rivera's background.  (Docket No. 77-1 at p. 5.) In that interview, Dr. Herbel was told that both defendant Rivera's sister and father suffer from schizophrenia; there is a history of domestic violence in the family, as defendant Rivera's father was physically abusive to defendant Rivera's mother; defendant Rivera has recurring nightmares in which people try to kill him; and that the nightmares worsened after his release from La Victoria jail. Id. at pp. 5-6.  Defendant Rivera's mother and sister claimed that defendant Rivera's incarceration for nine months in the Dominican Republic occurred under "horrible conditions"—according to defendant Rivera's sister, the inmates were not fed regularly, and defendant Rivera was forced to eat spoiled meat.  Id. at p. 7. They stated that in La Victoria jail, defendant Rivera was placed in a pickup truck, tied up, and left in the sun for five hours without being assessed by a doctor.  Id.  They also think defendant Rivera's mental condition worsened after being released from

custody—he now talks about seeing and having followed the devil, and he claims to have suffered greatly from having received injections of psychotropic medication in jail. Id.

Dr. Herbel's initial forensic report stated that defendant Rivera was unable to complete the recommended psychological testing at FMC Butner. (Docket No. 77-1 at p. 15.) Defendant Rivera was administered the audio version of the Spanish Minnesota Multiphasic Personality Inventory on January 26, 2011, but became distracted and refused to complete the test, indicating that the questions were too rapid for him to answer. Id. He agreed, however, to complete the test in regular paper-and-pencil format. Id. On February 9, 2011, a bilingual psychology intern met with defendant Rivera to explain the psychological testing and her role in escorting him to the group testing room. Id. After defendant Rivera stated that "the demon will not hurt me but it will hurt others" during the trip down to the testing clinic, the staff decided to return defendant Rivera to his unit rather than take him to the testing room "given his clinical presentation, along with his reported comments, his shakiness and mood liability." Id. at pp. 15–16.

### b.   Medical Impressions

Dr. Herbel concluded that defendant Rivera "presents as a complicated and perplexing diagnostic case," (Docket

No. 77-1 at p. 17), and is currently incompetent to stand trial. Id. at p. 18. He diagnosed defendant Rivera with psychotic disorder NOS and post traumatic stress disorder, id. at p. 16, and stated that if defendant Rivera's "report and presentation of psychiatric symptoms are taken at face value, he is severely and chronically mentally ill with poor prognosis of recovery. Based upon his current clinical presentation, he appears unable to effectively assist defense counsel." Id. at p. 18. He indicated that some of defendant Rivera's symptoms, like thought disorganization and distraction, "would be very difficult to feign." Id.

In several parts of his initial forensic report, however, Dr. Herbel alluded to possible malingering by defendant Rivera. Materials like the Indictment and reports and video recordings from 2006 of defendant Rivera's alleged criminal activity, Dr. Herbel noted, "describe [defendant] Rivera's active and reality based participation in a fairly elaborate series of criminal activities, which appear inconsistent with an individual suffering gross impairments from a major mental disorder." (Docket No. 77-1 at p. 9.) He also pointed to the atypical nature of defendant Rivera's reported hallucinations to raise doubts as to the veracity of all of his self-reported symptoms: defendant "Rivera's description of almost constantly seeing and hearing from

the spirit Madrid Jack since early childhood all the way into adulthood up to the current time is extremely atypical and not commonly reported by individuals suffering from chronic psychotic disorders." Id. at p. 17.  Moreover, individuals suffering from genuine chronic psychotic disorders "usually have reasonably intact memory functions despite their perceptual distortions . . . . [Defendant Rivera's] self-reported memory impairment is of questionable veracity, as it has obvious self-serving motivations in the current criminal prosecution and is in stark contrast to his ability to describe multiple details of his alleged maltreatment in jail in the Dominican Republic in 2006." Id. at p. 18.  Dr. Herbel explained that the fact that defendant Rivera "has demonstrated practically no improvement from multiple trials of psychotropic medication means he either has a severe treatment—refractory mental disorder—or that many of his self-reported psychiatric symptoms are not a manifestation of an underlying major mental disorder at all." Id. at pp. 18–19.

Despite the possibility of defendant Rivera's malingering, Dr. Herbel ultimately concluded in his forensic examination that defendant Rivera "is currently incompetent to stand trial."  (Docket No. 77-1 at p. 18.)  Dr. Herbel indicated that defendant Rivera "does appear to have genuine distress from his symptoms, which have persisted despite multiple adjustments in

the regimen of psychotropic medication." Id. He predicated, however, a "substantial probability that [defendant] Rivera's competency to stand trial can be restored with an additional period of treatment." Id. at p. 19.

### C. Mental Competency Hearings Conducted Between May 24, 2011 and April 26, 2012

Upon defendant Rivera's return from FMC Butner, the Court held a series of mental competency hearings in which Officer Mendez, Dr. Herbel, Dr. Luis and Drug Enforcement Agency ("DEA") Special Agent Jesus Roberto Gonzalez, who was defendant Rivera's case agent, testified for the government; and Dr. Romey, Dr. Vasco Daubon, Maria Sandoval, Esq., and Hilda Rivera testified for the defense.[5] On April 26, 2012, the Court continued the mental competency hearing. The government presented rebuttal evidence by calling Wilfredo Gonzalez-Lagares, defendant Rivera's MDC Guaynabo cell mate, and defendant Rivera called Dr. Carol Romey in Sur-Rebuttal. To make its determination as to defendant Rivera's competency, the Court recounts the most notable testimony presented from each stage in the competency hearings.

---

[5] The hearings took place on May 24, 2011, July 7, 2011, July 26, 2011, and October 11-14, 2011.

1.    **Prosecution's Case in Chief**

a.    **Doctor Herbel's Testimony**

After issuing his initial forensic report on February 23, 2011, but prior to the mental competency hearing on May 24, 2011, Dr. Herbel received additional evidence from the government.  (Docket No. 141 at pp. 119–20.)  After reviewing the evidence, he revised his opinion about defendant Rivera's competency.  Id.  Dr. Herbel testified that he is now of the opinion that defendant Rivera is competent to stand trial and has the capacity to assist his counsel in his defense.  Id. at p. 156. Most notably, Dr. Herbel now believes that defendant Rivera's true level of mental functioning is not severely impaired, as Dr. Herbel had originally concluded.  Id.  In Dr. Herbel's opinion, "the presence of a true psychosis is highly unlikely."  Id. at p. 154.

i.    **May 2011 Testimony**

As mentioned above, over the course of Dr. Herbel's evaluations at FMC Butner, defendant Rivera appeared capable of only recalling and focusing on a handful of subjects in detail—most prominently, the domestic violence he allegedly witnessed in his family, the abuse he allegedly suffered in the Dominican Republic jail in 2006, and the presence and actions of his reported imaginary friend, Madrid Jack.  (Docket No. 141 at p. 150.)  Though defendant Rivera could express those thoughts

vividly, he was at the same time apparently unable to recall more basic personal information like his name, details about his childhood, or his involvement in the activities leading to his arrest in 2006. (See Docket No. 77-1.) Moreover, defendant Rivera appeared unable to answer basic "yes" or "no" questions or to take psychological tests designed to gauge his cognitive ability while at either of the FMC facilities. (Docket No. 141 at pp. 22-32.) He presented himself to Dr. Herbel as if he were severely impaired and could not concentrate, id. at p. 150, and Dr. Herbel consequently concluded defendant Rivera "must really be horribly impaired." Id. at p. 31.

Yet, Dr. Herbel testified on May 24, 2011 that if one truly suffers from a static, impoverished, impaired mental status, one "would be very impoverished all the way through" and would not be able to turn mental capacity on and off. (Docket No. 141 at p. 141.) Defendant Rivera, in contrast, has exhibited the capacity to converse more in depth with people like other inmates, his girlfriend, and family members many times since his arrest in 2006. A nurse at FMC Butler, for example, witnessed defendant Rivera conversing animatedly with other Latino inmates for over an hour when Dr. Herbel was not present. (Docket No. 77-1 at p. 14.) Defendant Rivera's telephone calls made from MDC Guaynabo demonstrate his ability to interact with people, stay

focused on conversation, remember and discuss information from previous conversations in a reality-based manner, withhold information from individuals outside of jail, and anticipate the consequences of his actions. (Docket No. 141 at p. 149.) In addition, defendant Rivera's use of his commissary account shows that he has the wherewithal to manage his account, to follow procedures to make purchases, to place telephone calls, and to be able to transfer money electronically from his commissary account to his telephone account. Id. at p. 153.

Dr. Herbel also testified on May 24, 2011 that defendant Rivera is malingering—that defendant Rivera's presentation of severe cognitive deficits and visual auditory hallucinations is insincere. "Ever since that day, beginning when he had the dramatic deterioration of his mental status after court, that presentation has consistently been exaggerated or feigned." (Docket No. 141 at p. 157.) Dr. Herbel reached this conclusion by noting blatant inconsistencies in defendant Rivera's behavior in FMC Butner with evidence obtained by the government in this case.

First, Dr. Herbel notes an inconsistency in defendant Rivera's behavior in Dr. Herbel's presence and when defendant Rivera believes he is not being observed. Whenever Dr. Herbel was in the unit at FMC Butner, defendant Rivera "always appeared very distressed, . . . odd, reclusive, [and]

uncomfortable, so [Dr. Herbel] never saw him interacting with peers in any kind of a normal manner." (Docket No. 141 at p. 25.) Moreover, in his interviews with Dr. Herbel, defendant Rivera lost focus and concentration easily, and he consistently diverted conversation to discussions about his visual hallucinations. Id. at pp. 25–26. He told Dr. Herbel that he has an imaginary friend, Madrid Jack, who "had been around him since his early childhood, who would speak to him, console him, help protect him, make him feel strong[,] [a]nd that this figure, this spirit, was always present with him even through adulthood." Id. at p. 15.

In contrast, defendant Rivera's behavior outside of Dr. Herbel's presence demonstrates an ability to engage in conversations without hallucination or distraction. Dr. Herbel interprets the FMC Butner nurse's report of defendant Rivera's animated interaction with other inmates to mean that defendant "actually has a capacity to [interact in a normal manner] if he chooses." (Docket No. 141 at p. 25.) Consequently, Dr. Herbel questions the genuineness of defendant Rivera's erratic behavior and doubts that defendant Rivera's reported visual hallucinations are a product of severe psychosis. He testified that people who have genuine psychotic problems do not tend to experience visual hallucinations as consistently as defendant Rivera reports to experience them: "[H]aving visual–vivid visual hallucination in a

clear sensorium is very, very unusual and not typically seen in people, say, [with] schizophrenia or bipolar disorder." Id. at p. 16. Moreover, that defendant Rivera described Madrid Jack in a calm and clear manner was "very unusual [and] very atypical," given that he could not talk about other issues with Dr. Herbel without sobbing and becoming upset. Id. When defendant Rivera debriefed DEA agents in 2006 in an organized, coherent, and reality-based manner, he did so "without confusion, without any discussion of invisible friends, without memory impairment, and without complaints of being tortured." Id. at pp. 44-45. He has also spoken to his girlfriend and family members on the phone without exhibiting bizarre features, referencing invisible friends, or hearing voices. Id. at p. 72. That evidence shows that defendant Rivera is capable of holding lucid conversations without appearances by Madrid Jack and leads Dr. Herbel to conclude that defendant is feigning his mental incapacitation.

Second, Dr. Herbel questions defendant Rivera's credibility as to his claims of being repeatedly tortured in the Dominican Republic jail in 2006. In his initial forensic report, Dr. Herbel explained that defendant Rivera's vivid and detailed description of watching his Haitian cell mate being beaten to death and becoming splattered with his cell mate's blood while in restraints was a "horrible event [that] seemed to be a plausible

intervening event" in defendant Rivera's life that explained his deterioration between his arrest in 2006 and the time Dr. Herbel evaluated him. (See Docket No. 77-1 at p. 9; Docket No. 141 at pp. 17-18.) Moreover, this intervening event fit with defendant Rivera's family's assertion that when he came back from jail in the Dominican Republic "he went from bad to worse." Id. at pp. 17-18.

Two Reports of Investigation ("ROIs") taken in October and December, 2006, as well as testimony from DEA Special Agent Jesus Roberto Gonzalez, however, now lead Dr. Herbel to a different conclusion. Id. at pp. 20-21. The evidence shows that defendant Rivera debriefed DEA agents as to specific names, locations, and events pertaining to the drug conspiracy in which he allegedly participated in the Dominican Republic. (See id. at pp. 40-52, 78-93.) According to Dr. Herbel, defendant Rivera was "giving information that appears to be organized, coherent, reality based, implicating him in this well-orchestrated series of illegal transactions with multiple co-conspirators, without confusion, without any discussion of invisible friends, without memory impairment, without complaints of being tortured." Id. at pp. 44-45. This shows not only that defendant Rivera had the capacity to provide multiple details in a lucid manner about his background and recent activities, but also that he could do so after spending several months imprisoned in a place where he

purports to have been "broken" by suffering repeated bouts of physical torture.  Id.  The ROIs confirmed that defendant Rivera reported having been attacked with a hypodermic syringe on one occasion while in the jail, but there was no other evidence to confirm the claims of repeated torture defendant Rivera later reported to Dr. Herbel.  See id.  "[T]he date in the December memo, to [Dr. Herbel], was extraordinary because it really undermines the . . . model that what happened to him in that jail broke him down completely.  It undermines his credibility of being repeatedly tortured there."  Id.

In light of such evidence, Dr. Herbel now doubts whether defendant Rivera's behavior evidences true psychosis.  He states that it would be unusual for someone who truly suffers from chronic psychosis to become so severely impaired in a matter of hours—as defendant Rivera apparently did after his arraignment in 2010—without some external stimuli.  (Docket No. 141 at pp. 131–32.)  "The degree of compensation here in this very short time window is consistent with somebody who has been intoxicated, ingested some kind of a psychotic substance, or had a severe head injury that day.  It is not consistent with what I would expect to see in someone having exacerbation of a chronic disorder."  Id. at p. 132.

Dr. Herbel also reports that defendants with severe mental impairments typically can give a "yes" or "no" answer to dichotomous questions, even if the answer they give is not correct.  (Docket No. 141 at p. 23.)  Defendant Rivera's inability to answer such questions suggests "that he was uncertain how to answer and so he acted as if he couldn't understand because he is trying to control information he disclosed to look mentally ill."  Id.  Because defendant Rivera has been able to hold conversations in which he not only answers "yes" and "no" but also engages in lengthy and coherent conversations since leaving FMC Butner, Dr. Herbel now believes that defendant Rivera's diminished mental capacity "was exaggerated or feigned."  Id. at pp. 31-32.  Finally, Dr. Herbel points to defendant's unresponsiveness to medication as an indication of malingering:

> Nothing I prescribed worked.  Nothing seemed to help him much.  And so that either means, you know, he's one of the unlucky few who has a condition that medication doesn't help, or in the case of somebody who's exaggerated or feigning symptoms, they're not getting better because they're not sick, and whatever treatment you give them, their major investment is appearing impaired so they're not going to get better because they don't want to get better.

Id. at p. 34.

### ii. October 2011 Testimony

Having reviewed further additional evidence,[6] Dr. Herbel testified again on October 11, 2011 to his conclusion that defendant Rivera is competent to stand trial. (See Docket No. 220.) Dr. Herbel testified that he considered the additional evidence in order to make a more informed decision as to defendant Rivera's competency, credibility, and consistency. Id. at p. 5. Ultimately, the additional evidence directs Dr. Herbel to the conclusion that defendant Rivera is competent because he lacks credibility as to true mental sickness and he has been inconsistent in his reports of his mental impairments. Id.

A review of Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents' interactions with defendant Rivera in 2006 leads Dr. Herbel to surmise now that the alleged abuse defendant Rivera claimed to have suffered in jail "never occurred and that is a fabrication designed in favor of getting sympathy from family and authorities, getting out of his prosecution in Dominican Republic and getting out of prosecution

---

[6] Dr. Herbel testified that the following documents were made available to him after he issued his original forensic report: transcripts of additional telephone calls recorded from defendant Rivera's confinement, defendant Rivera's social security record, Dr. Luis' addendum, a translation of a memo submitted describing a possible suicide attempt by defendant Rivera in custody in 2006, updated entries in the Bureau of Prisons ("BOP") psychology data system, and the BOP electronic medical record. (Docket No. 220 at pp. 4-5.)

now." (Docket No. 220 at p. 13.) He concludes that defendant Rivera was competent in 2006 by comparing the ATF agents' reports, which indicate that defendant Rivera was coherent in the Dominican Republic in 2006, with the pre-trial services interview report, which also demonstrates defendant Rivera's ability to think logically and offer extensive background information in a logical manner. Id. He then analyzed various accounts of defendant Rivera's behavior—including his evaluation at FMC Miami, his telephone calls with his girlfriend and family members at MDC Guaynabo, and his evaluations by Dr. Romey—and discerned blatant inconsistencies in defendant Rivera's behavior and mental capacity. Id. at pp. 12-14. By speaking to his family and girlfriend about his lawyer, defendant Rivera has shown that "he understands that he does have a lawyer, that his family members and doctors can speak with the lawyer, and [that] the lawyer can take action on his behalf as his advocate." Id. at p. 24; see also id. at pp. 16 & 34. In light of the inconsistencies exhibited by the additional evidence, Dr. Herbel believes that defendant Rivera "is not credible in his presentation of mental health impairments" and is therefore competent to stand trial. Id. at pp. 9-15.

### b. Doctor Luis's Testimony

Upon attending defendant Rivera's competency hearing on May 24, 2011, and after considering the testimony of

Dr. Herbel and DEA Special Agent Gonzalez, the transcripts of defendant Rivera's recorded telephone calls, records of defendant Rivera's court appearances, and the pre-trial services report, Dr. Luis also revised his forensic report regarding defendant Rivera's diagnosis, mental status, and trial competency. (Docket No. 164-1 at p. 2.) He changed his diagnosis from the original forensic report to "Axis I: Malingering, V65.2,[7] and Axis IV: Problems related to interaction with legal system/crime." Id. at p. 3. Dr. Luis now concludes that defendant Rivera "appears to be malingering[8] cognitive and psychiatric impairment due to his perception that he might avoid entirely, or receive diminished repercussions, for his alleged criminal behavior." Id.

The most important indication of defendant Rivera's fabrication of mental impairment, in Dr. Luis' opinion, stems from the discrepancy between defendant Rivera's behavior at FMC Miami and FMC Butner and his behavior in his monitored telephone conversations while detained at MDC Guaynabo, his pre-

---

[7] Dr. Luis' revised report defines the essential feature of Malingering as "the intentional misrepresentation or exaggeration of physical or psychological symptoms, for gains such as receiving diminished legal ramifications." (Docket No. 164-1 at p. 4.)

[8] "Malingering should be considered when any of the following combinations occur: lack of cooperation during the evaluation, there is evidence for the presence of Antisocial Personality Disorder, the presentation occurs in a medicolegal context, or there is marked discrepancy between subjective and objective findings." (Docket No. 164-1 at p. 4.)

trial services interview in 2010, and his interviews with DEA agents in 2006. (Docket No. 164-1 at pp. 3-4.) These conversations were not only inconsistent with defendant Rivera's presentation during the evaluation periods at FMC Miami and in BOP medical and mental health contacts, id., but they also exhibited "a stark difference" in defendant Rivera's mental status from the person that Dr. Luis assessed. (Docket No. 220 at p. 177.) Even though defendant Rivera asks for certain points of clarification during his phone calls, for example, the larger picture shows that defendant Rivera is able to follow the general content of the conversations, he understands what he is being told, he can interact with the listener, and "he's able to assimilate new information as it relates to the legal setting." Id. at pp. 178-79. In addition, the conversations reveal that defendant Rivera "has an awareness of his current legal situation and mental health evaluations, as well as the role of his attorney as a representative and advocate. Further, he appears to communicate his needs to his attorney by enlisting his family members to contact his attorney." (Docket No. 164-1 at p. 4.)

Dr. Luis acknowledges that a mere finding that a person meets criteria for a malingering classification "does not exclude the presence of legitimate psychiatric condition." (Docket No. 164-1 at p. 4.) He ultimately concludes, however, that

defendant Rivera's "reported symptomatology and behavioral presentation is not consistent with any known pattern of mental illness." Id. Recommending that defendant Rivera be found competent to stand trial, Dr. Luis opines, "[C]ollateral sources of information and monitored conversations demonstrated no active mental states that would interfere with his rational understanding of the proceedings or his ability to assist toward his defense, if he were motivated to do so." Id. at p. 5.

### 2. Defendant's Case-in-Chief

### a. Dr. Vasco J. Daubon

Dr. Vasco J. Daubon, a clinical psychologist at MDC Guaynabo, testified on October 13, 2011—as a treating physician and not an expert witness—about defendant Rivera's behavior during his incarceration at MDC Guaynabo. (See Docket No. 222.) At the time of his testimony, Dr. Daubon had not reviewed any transcripts of defendant Rivera's competency hearings, any audio or video recordings the DEA recorded of defendant Rivera in 2006, the reports that summarize defendant Rivera's alleged involvement in a drug conspiracy in 2006, or any of the telephone calls defendant Rivera made from MDC Guaynabo, and he could not recall if he reviewed the pre-trial services interview of defendant Rivera. Id. at pp. 26–27.

Since 2010, Dr. Daubon has interacted with defendant Rivera approximately once a week during "main line" at MDC, which occurs when managers visit the inmate units at lunchtime to attend to any inmate's needs. (Docket No. 222 at p. 6.) Dr. Daubon noted that defendant Rivera typically approaches him during "main line," and they usually interact for approximately five to ten minutes. Id. at pp. 5-6, 13, 23-24. He has also been called to intervene with defendant Rivera when defendant Rivera suffers episodes of high anxiety in his unit. Id. at pp. 6, 11-12. During such instances, Dr. Daubon escorts defendant Rivera to the health services department for a medical evaluation, and he spends approximately twenty to thirty minutes with defendant Rivera. Id. at pp. 23-24.

Dr. Daubon views the medication prescribed to defendant Rivera as "appropriate" and believes that defendant Rivera takes his medication every day as prescribed. (Docket No. 222 at p. 14.) A review of defendant Rivera's medication reveals that he receives antidepressant, antipsychotic medication, and mood stabilizers. Id. at p. 16. Dr. Daubon states that the medication prescribed to defendant Rivera typically calms defendant Rivera, but that about once a month defendant Rivera is re-admitted to the hospital due to "decompensation." Id. at p. 17. He defines "decompensation" in defendant Rivera's case to mean that "some

outside stimulus[,] like new or some type of event," causes defendant Rivera's anxiety to increase and overcome the effectiveness of his medication. Id. at pp. 15, 17-18.

Dr. Daubon describes defendant Rivera as a quiet person, who reports visual and auditory hallucinations, and whose nonverbal behavior demonstrates high anxiety and confusion. (Docket No. 222 at p. 7.) He reports defendant Rivera's "high anxiety" periods to involve crying; sweating; trembling of the hands, lips, and eyelids; and auditory and visual hallucinations. Id. at p. 15. In a note Dr. Daubon wrote after a suicide prevention program follow-up with defendant Rivera, Dr. Daubon described defendant Rivera as disoriented, incoherent, having used psychotic speech, and having increased fear in space, time, and place. Id. at p. 15.

To Dr. Daubon, who had not reviewed any additional evidence outside of his personal interactions with defendant Rivera, it is "very improbable" that defendant Rivera is malingering during the high anxiety periods. (Docket No. 222 at pp. 7-9.) He does not think defendant Rivera malingers in his anxiety, mood, and delusions. Id. at pp. 20-21. He believes it is very difficult to fake symptoms like depression—especially symptoms like the trembling, sweating, and crying profusely that defendant Rivera exhibits. Id.

b.    **Hilda Rivera-Luquis**

Defendant Rivera's mother, Hilda Rivera-Luquis, testified on October 23, 2011 about her son.  (Docket No. 222 at p. 29.)  Briefly reminiscing about certain memories from defendant Rivera's childhood, Ms. Rivera testified that her son "was not a normal child," id., and that he was unable to hold a stable job. Id. at pp. 32-33.  Ms. Rivera testified that when defendant Rivera was arrested and placed in La Victoria jail in the Dominican Republic in 2006, she flew to Santo Domingo to stay for weeks at a time because she knew that her son "was ill" and was taking medication.  Id. at pp. 35-36.  On Wednesdays and Sundays, she visited defendant Rivera for an hour.  Id. at p. 44.  She claimed to have noticed that the jail placed fourteen inmates to a cell, that defendant Rivera slept on the floor, and that he did not have any food, water, or electricity.  Id. at p. 36.  Ms. Rivera stated that defendant Rivera received injections at La Victoria because the pills he took were ineffective.  Id. at p. 38.  She did not know what medication her son received through the shots, but she testified that "whatever they were injecting into him was killing him."  Id. at pp. 37-38.

When asked about defendant Rivera's psychological state after returning from Santo Domingo in 2007, Ms. Rivera described her son as "more restless" and "desperate."

(Docket No. 222 at p. 40.) She claimed that his children left him, he fell into depression, and he told her he heard voices directing him to hang himself. Id. at p. 41. She sought psychiatric treatment for her son, and from 2007 until his arrest in 2010, defendant Rivera received psychiatric and/or psychological care at a low-income treatment center in Manati, Puerto Rico. Id. at p. 40. Since his arrest in 2010, defendant Rivera has continued to receive mental health treatment through APS Clinical of Puerto Rico ("APS"). Id. at pp. 41–42.

Ms. Rivera also testified about her interactions with defendant Rivera throughout his incarceration at MDC Guaynabo. She has spoken over the phone with defendant Rivera and claims that most of the time an inmate makes the call for her son, tells her to deposit money for defendant Rivera's commissary account, and then passes the phone to her son. (Docket No. 222 at pp. 46–48.) Defendant Rivera also tells Ms. Rivera that he needs money for his commissary account, and when he does so, Ms. Rivera deposits money into the account for him. Id. at pp. 46–47. Ms. Rivera admitted to making calls in which she instructed defendant Rivera to call Yari, the girl he was dating at the time of his arrest in 2010. Id. at pp. 48–51. She claimed not to remember why she gave Yari's telephone number to defendant Rivera, id. at p. 50; she said she did not know if her son ever called Yari, id. at

p. 51; and she denied knowing whether her son used a contraband cell phone to call Yari. <u>Id.</u> at pp. 52-53. Upon attending a hearing held by this Court, Ms. Rivera found out that the government was monitoring defendant Rivera's telephone conversations from MDC Guaynabo, <u>id.</u> at p. 55, but she denied communicating that information to her son when she visited him. <u>Id.</u> at p. 54.

### c.  Dr. Carol Romey

Dr. Carol Merced Romey-Lillyblad ("Dr. Romey"), a practicing forensic psychologist retained by defendant Rivera's parents and attorney, testified on October 23, 2011. (<u>See</u> Docket No. 223.) Dr. Romey evaluated defendant Rivera's mental health history by compiling and reviewing defendant Rivera's 2006-2009 medical records from APS, the Social Security Administration, and the Dominican Republic, as well as the evaluations from FMC Miami, FMC Butner, and MDC Guaynabo. <u>Id.</u> at pp. 10-26. She described defendant Rivera's mental health problems as "extensive," <u>id.</u> at p. 14, and she found that defendant Rivera is "always" medicated, "whether it's MDC or APS or Santo Domingo[9] or before" and that he

---

[9] Dr. Romey also confirmed Ms. Rivera's testimony that defendant Rivera received injections in La Victoria jail in 2006. Although she believed the medication was an antipsychotic, she did not have a complete record of the treatments to confirm exactly which medication defendant received via injection. (<u>See</u> Docket No. 223 at pp. 14-15.)

receives a heavy dosage of antidepressants, antipsychotic and mood stabilizer medication. <u>Id.</u> at p. 13. Dr. Romey noted that numerous doctors throughout defendant Rivera's medical records classify defendant Rivera as suffering from a wide range of problems: depression, anxiety, chronic schizophrenia, paranoia, bipolar disorder, impulse control disorder, and alcohol dependence. <u>Id.</u> at pp. 12, 16-17, 25-26. Indeed, over a five-year period, twenty-two health professionals treated defendant Rivera and found him to suffer from some form of psychotic or bipolar disorder. <u>Id.</u> at p. 26. Dr. Romey opined that defendant Rivera has been responsive to treatment in the sense that he remains stable with only "periodic episodes of decompensation"—when some external stimuli trigger emotional distress or anxiety in defendant Rivera. <u>Id.</u> She believed that such periodic episodes, however, are consistent with his condition, <u>id.</u>; Because his condition is bipolar, there are ups and downs. <u>Id.</u> at p. 42. "[N]o one, no psychiatric patient, is psychotic and unstable 24-7," she concluded. <u>Id.</u> at p. 28.

Dr. Romey also discredited the findings and analyses of Dr. Luis and Dr. Herbel by criticizing their reliance on the recorded telephone conversations, the pre-trial services report, and MDC Guaynabo commissary records. First, she disapproved of their "cherry-picking" strategy of taking bits and

pieces of defendant Rivera's recorded phone conversations out of context, and making "clinical judgments on chit chat." (Docket No. 223 at p. 29.) She stated that "in none of [the instruments that forensic psychologists use to determine competence to stand trial] is there any category of data based on phone conversations from a prison." Id. at p. 29–30. The phone conversations, she contended, are not clinically relevant data, because they do not provide the examiner with physical observations of a patient's status, like executive functions, stressors, speech, eye contact, facial expressions, attitudes, posture, sensorium, grooming, and stature—which, as a whole, give the examiner a full conclusion as to mental capacity. Id. at pp. 36–41. Although she refused to formulate an opinion as to defendant Rivera's mental status based on the telephone calls, id. at p. 41, Dr. Romey did view defendant's family's conversations as demonstrative of loving support instead of evidence of malingering. Because they know that defendant Rivera is depressed, she says, his family is trying to be supportive, keep him oriented and animated, make conversation with him to keep him focused, and hoping that some day he will return to their home. Id. at p. 30.

Second, Dr. Romey disagreed with Dr. Luis and Dr. Herbel's inferences of malingering from a review of the pre-trial service report. She explained defendant Rivera's ability to

answer questions and provide extensive background information in the pre-trial services interview, as well as his subsequent inability to answer questions when he returned to MDC and at his arraignments, as a natural course of his bipolar disorder. (Docket No. 223 at pp. 50-51.)  "Bipolar, by definition, is an unstable mood disorder.  It has ups and downs.  And they can be rapid succession or they can be prolonged.  He can be stable for months, and he can be unstable in periods of hours.  That's his condition. So it's – clinically, it's very understandable."  Id. at p. 50.

Third, Dr. Romey deemed commissary records as an invalid clinic instrument and as irrelevant to a determination of defendant Rivera's mental health.  (Docket No. 223 at pp. 43-44.)  Because defendant Rivera's family "is very attentive to him," Dr. Romey believed that other inmates could have been pressuring defendant to solicit more funds for their benefit and not necessarily for his own.  Id.  She concluded that the commissary records have "nothing to do with his ability to relate to counsel and participate in a court setting."  Id. at p. 44.

Dr. Romey also testified that defendant Rivera has an extensive history of bipolar disorder, and to outright change a previous diagnosis to malingering without attempting to integrate the new information is unacceptable clinical practice. (Docket No. 223 at p. 81.)  In her opinion, Dr. Luis and

Dr. Herbel's decisions to change their clinical conclusions based on additional evidence like recorded telephone calls, the pre-trial services report, and commissary records are erroneous, id. at pp. 66–68, particularly "because they did not assess malingering as malingering is now assessed clinically." Id. at p. 101. She also does not believe that one can feign the type of sweating, trembling and crying to the degree defendant Rivera exhibits in her examinations. Id. at p. 98. Indeed, she pointed to defendant Rivera's presence at the competency hearings that week as an example of his physical symptoms. Dr. Romey claimed to observe defendant's whole body tremble on and off as he sat with his head down, and she described defendant Rivera as non-responsive and passive throughout the hearings. Id. at p. 170. She also claimed that he was "obviously medicated" and could not conclude the degree to which defendant Rivera was able to understand the mental competency hearings. Id. Dr. Romey doubts that defendant Rivera has been "fooling everybody for [thirty] years in all kinds of academic, employment, family, prison, [and] . . . evaluations," id. at pp. 160–161, and even questions why he would want to fool "so many people for so long in so many different scenarios without any gain whatsoever." Id. at p. 161. "[H]e didn't suddenly become ill. He's been ill all his life." Id. at p. 68. Although Dr. Romey does foresee a time when defendant Rivera may be able to

recover sufficient cognitive abilities to be able to participate in his criminal defense, she believes defendant Rivera to be currently incompetent to stand trial.  Id. at pp. 101–07.

### d.    Maria Sandoval

On October 14, 2011, attorney Maria Sandoval testified that on March 18, 2010 she visited defendant Rivera in MDC Guaynabo for the purpose of representing him.  (Docket No. 223 at p. 117.)  During their visit, defendant Rivera appeared "very lethargic, very slow speaking, very depressed and very disoriented."  Id. at p. 112.  He evaded eye contact, could not answer Ms. Sandoval's questions about the indictment and upcoming arraignment, and at one point in the conversation he stated that he believed two MDC officials, who stood in the MDC Guaynabo interviewing area, were the same guards who removed defendant Rivera from Santo Domingo to Puerto Rico.  Id. at pp. 112–113.  The next day, Ms. Sandoval prepared and sent a transfer memo documenting her observations to Ms. Anita Hill, defendant Rivera's current attorney, after Ms. Hill undertook the case.  Id. at p. 113.

### 3.    Prosecution's Rebuttal

On April 26, 2012, Wilfredo Gonzalez-Lagares, who shared a cell with defendant Rivera in MDC for thirteen and a half months, testified about his observations and interactions with

defendant Rivera.  (See Docket No. 339.)  He stated that defendant

Rivera told him that defendant Rivera had been charged for drugs,

which carried a sentence of between nine and eleven years, but that

defendant Rivera also expected to serve less than that amount of

time because "he was faking that he was not well" in order to be at

MDC "the least time as possible."  Id. at pp. 5-6.  Defendant

Rivera told Mr. Gonzalez that he had been evaluated psychologically

in federal prisons in the United States and claimed "he was not fit

for many things."  Id. at p. 45.  Mr. Gonzalez testified that when

people were around, defendant Rivera acted like he was always

upset, would get in a bad mood intentionally and look at everyone

cross-eyed, and would hit the walls with his fists.  Id. at

pp. 6-7.  When defendant Rivera was alone with Mr. Gonzalez in

their cell and thought that no one was watching him, however,

defendant Rivera would talk, read, play cards, doodle, and play tic

tac toe naturally.  Id. at p. 7.

          Mr. Gonzalez stated that defendant Rivera does not

consume all of the medication that the prison guards give to him;

rather, he takes only the pills that make him less anxious, and he

flushes the rest of the medication down the toilet.  (Docket

No. 339 at p. 8.)  When asked about how defendant Rivera

differentiates between the pills for his anxiety and the rest,

Mr. Gonzalez stated that defendant Rivera explained that he knows

the process for each medication because he worked at several medication manufacturing plants, he would prepare the medication, and he knows the effect of each medication that he manufactured. Id. at p. 9.

        Mr. Gonzalez also admitted to making phone calls for defendant Rivera when defendant Rivera asked him to do so.  (Docket No. 339 at p. 9.)  He stated that around March or May, 2011 defendant Rivera would ask him to call his relatives "[s]o no one would notice that he knew how to use the phone."  Id. at pp. 9-10. Mr. Gonzalez also made phone calls to his own girlfriend to discuss defendant Rivera's case, id. at p. 15, and he occasionally did so using defendant Rivera's telephone account with defendant Rivera's explicit authorization.[10]  Id. at p. 51.  While defendant Rivera sat next to him, for example, Mr. Gonzalez called his girlfriend to discuss information about defendant Rivera's competency hearing. Id. at p. 13.  Mr. Gonzalez's girlfriend knew defendant Rivera's family, and one day, in the MDC parking lot, defendant Rivera's relatives asked her both to let them know about anything pertaining to defendant Rivera and to relay information to defendant Rivera through Mr. Gonzalez.  Id.  At that time, defendant Rivera's mother

---

        [10] Mr. Gonzalez explained that defendant Rivera authorized the calls by speaking his own name into the telephone after Mr. Gonzalez dialed the telephone number of his girlfriend or family members.  (Docket No. 339 at p. 52.)

knew that her son's telephone calls had been intercepted, and so she asked Mr. Gonzalez's girlfriend to leave text messages or voicemails about defendant Rivera.  <u>Id.</u> at p. 14.  Ms. Rivera relayed information that she learned from defendant Rivera's lawyer to Mr. Gonzalez's girlfriend, who would then communicate the information to Mr. Gonzalez during their phone calls.  <u>Id.</u> Mr. Gonzalez stated that eventually he stopped relaying information for defendant Rivera because it started to annoy him and his girlfriend.  <u>Id.</u> at p. 15.  Once he refused to make these types of calls, defendant Rivera got upset and annoyed.  <u>Id.</u>  Finally, defendant Rivera commented to Mr. Gonzalez that his lawyer warned defendant Rivera not to use or think about using a cell phone inside prison "because he was being recorded."  <u>Id.</u>

### 4.    Defendant's Sur-Rebuttal

Dr. Romey testified again on April 26, 2012 that defendant Rivera's condition "continues to be a major mental illness with serious psychotic material which impairs his ability to participate effectively in his defense . . . ."  (Docket No. 339 at p. 68.)  She bases her opinion partly on an interview that

occurred by mistake at MDC by Dr. Alexandra Ramos,[11] a psychologist who is Dr. Romey's daughter, and on statements made by Dr. Gisela Perez[12] at MDC Guaynabo about defendant Rivera's condition.  Id. at pp. 69-70.  During her unintentional visit with defendant Rivera, Dr. Ramos spent two hours performing tests and interviews to determine his mental health status.  (Docket No. 207 at Exhibit 000 at pp. 5-6.)  She noted that defendant Rivera appeared significantly distressed and anxious, his hands and nose were sweating profusely, and his speech was tangential and incoherent. Id. at p. 5.  Defendant Rivera could not provide sufficient responses to Dr. Ramos' questions to complete the testing successfully, because he failed to follow instructions and veered

---

[11] When Dr. Ramos arrived at MDC on December 2, 2011, she requested to interview an inmate named Luis Rivera-Melendez. (Docket No. 339 at p. 75.)  MDC staff, however, mistakenly brought defendant Rivera to the interview.  Id.  Dr. Ramos had never interviewed Mr. Luis Rivera before, so she did not realize that the person she was interviewing was not actually Mr. Luis Rivera.  Id. Although Dr. Ramos continually called defendant Rivera "Luis" throughout the interview, defendant Rivera did not correct her, and Dr. Ramos conducted the interview pursuant to protocol.  Id.  It was not until the next week—after making phone calls to counsel in Mr. Luis Rivera's case and receiving several calls from defendant Rivera's family—that Dr. Ramos and Dr. Romey pieced together what had happened and realized that Dr. Ramos had conducted an interview and issued a report about defendant Rivera's mental competency. Id. at pp. 76-77.

[12] Dr. Romey briefly states that she "conversed recently" with Dr. Perez, and that Dr. Perez told Dr. Romey informally that defendant Rivera "has some good days and bad days, but his condition is continuing, is consistent."  (Docket No. 339 at p. 69.)

into tangential subjects[13] frequently.  _Id._  Dr. Ramos suggested that "[H]is mental illness interfered with his performance on the test," _id._, and she concluded that his current mental health "is severely deteriorated and unstable."  _Id._ at p. 6.  Dr. Ramos diagnosed defendant Rivera with schizoaffective disorder, bipolar type, which encompasses symptoms of psychosis and a mood disorder, mania, or depression.  _Id._

After listening to the testimony of Mr. Gonzalez, Dr. Romey remains unpersuaded that defendant Rivera's mental condition is anything other than incompetent to stand trial. (Docket No. 339 at p. 71.)  Pronouncing Mr. Gonzalez's testimony as self-serving, unreliable, and insubstantial, Dr. Romey is not compelled to re-examine defendant Rivera's mental condition in light of the new testimony.  _Id._ at pp. 80-84.  She doubts the veracity of Mr. Gonzalez's testimony because of his interest in providing testimony to reduce his own sentence, and because she

---

[13] Among the many subjects defendant Rivera discussed with Dr. Ramos were:  his belief that he has reptiles or insects crawling in his veins; his experience of eating cockroaches and worms as a child; voices that tell him, 'hang yourself you miserable bastard'; a dragon named Draco, who cuts himself and even tried to cut his own throat; tasting blood; defendant Rivera's destiny of becoming 'a total warrior;' voices that tell him to hurt his roommate because his roommate's snoring bothers him; and defendant Rivera's belief in a man named Madrid Jahar, who is always with defendant Rivera, who gives defendant Rivera strength and protection, and who has been with defendant Rivera since childhood.  _Id._ at pp. 2-4.

claims that much of the information Mr. Gonzalez said he observed and learned about defendant Rivera was not factually accurate.  Id. at pp. 85-89.

Dr. Romey denies that defendant Rivera has been able to fool "many different kinds of people over [thirty-nine] years" in medical, hospital, and correctional settings because that would require a level of incredible sophistication that, in defendant Rivera's case, "would be extraordinary."  (Docket No. 339 at p. 81.)  Instead, Dr. Romey considers the additional evidence of Dr. Ramos' report, which she regards as consistent with all of the reports, diagnoses, and findings of medical personnel who evaluated defendant Rivera from 2006 through 2011, to bolster her conclusion. Id. at pp. 78-79.  She emphasizes that "everybody has seen" defendant Rivera's suicide ideation, psychotic process, delusions, and hallucinations, id., and she considers defendant Rivera's history of mental illness to be most indicative of his current mental status.  Dr. Romey thus maintains her position that defendant Rivera is clinically incompetent.  Id. at p. 93.

## III. DISCUSSION

### A. Competency Standard

It is well-settled that "[a] defendant's due process right to a fair trial includes the right not to be tried, convicted or sentenced while incompetent."  United States v. Gonzalez-

Ramirez, 561 F.3d 22, 28 (1st Cir. 2009) (citing Drope v. Missouri, 420 U.S. 162, 172-73 (1975)); see also United States v. Sanchez-Ramirez, 570 F.3d 75, 80 (1st Cir. 2009).  "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial." Riggins v. Nevada, 504 U.S. 127, 139 (1992) (Kennedy, J. concurring in judgment) (citing Drope, 420 U.S. at 171-72).  The United States Supreme Court has stated that the "test for competency must be whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996) (citing Dusky v. United States, 362 U.S. 402, 402 (1960) (*per curiam*)). Title 18, United States Code, Section 4241 adopted and incorporated this test, United States v. Wiggin, 429 F.3d 31, 36-37 (1st Cir. 2005), and provides that a district court should conduct a hearing regarding a criminal defendant's competency where it finds reasonable cause to believe that the defendant is incompetent. 18 U.S.C. § 4241(a) and (c).

Upon conducting a mental competency hearing, a district court is tasked with determining a defendant's mental competency by weighing the evidence presented.  See Wiggin, 429 F.3d at 37. Courts "may rely upon various kinds of evidence, including written

medical opinions and observations by the court, counsel, and defendant himself regarding the defendant's demeanor and fitness to stand trial." United States v. Muriel-Cruz, 412 F.3d 9, 13 (1st Cir. 2005). A court is "fully entitled to accept parts of the testimony of the [defendant] and [his] experts yet reject the ultimate conclusion that they advocated." Pike v. Guarino, 492 F.3d 61, 76 (1st Cir. 2007) (citing Santos, 131 F.3d at 20-21, and United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000) (explaining that a factfinder "has the prerogative to credit some parts of a witness's testimony and disregard other potentially contradictory portions")).

        In analyzing a defendant's competency to stand trial, a court must consider whether defendant: (1) understands "the nature of the proceedings against him," and (2) is "able to cooperate with counsel in his defense." Robidoux v. O'Brien, 643 F.3d 334, 339 (1st Cir. 2011). Because this "is a functional inquiry," it is possible for a defendant to have a serious mental illness but still be able to understand the proceedings and rationally assist his counsel. United States v. Widi, 684 F.3d 216, 220-21 (1st Cir. 2012).

## B.  Defendant Rivera's Competency to Stand Trial

        The evidence in this case supports a finding that defendant Rivera is competent to stand trial. The government

presented two comprehensive forensic evaluations with addenda
(Dr. Luis from FMC Miami and Dr. Herbel from FMC Butner) that
recommend defendant Rivera be found competent.  There is also a
contradictory evaluation by Dr. Romey, offered by the defense,
concluding the opposite.  Having considered the clinicians'
testimony and reports and all other evidence presented at the
mental competency hearings, however, the Court finds the forensic
reports of Dr. Luis and Dr. Herbel to be of the heaviest weight and
greatest credit.  This is because they depict a more complete and
accurate picture of defendant Rivera's mental competency.  See
United States v. General, 278 F.3d 389, 398 (4th Cir. 2002 (finding
a report "entitled to significant weight because it is the most
recent and comprehensive evaluation" of defendant's competency).

        Defendant Rivera's counsel acknowledges that collateral
information "is very important to obtain a broader understanding"
of defendant Rivera's mental capacity.  (See Docket No. 220 at
p. 192.)  Yet defendant Rivera would have this Court discredit
altogether the recorded MDC Guaynabo telephone calls and
Mr. Gonzalez's testimony and conclude that defendant Rivera is
incompetent.  Considering only those observations obtained solely
though clinical interview experiences with a defendant, however, is
an unwise approach—especially in a case where a defendant may be
malingering.  It is precisely the evidence obtained outside of a

clinical setting, when a defendant is unsuspecting of being watched or evaluated, that can shed light on a defendant's true colors.

In this case, Dr. Luis and Dr. Herbel initially concluded that defendant Rivera was extremely impaired and mentally incompetent by basing their opinions on data obtained at the clinical level. Similarly, Dr. Romey determines defendant's incompetency by relying thoroughly on defendant Rivera's history of mental illness diagnoses. Dr. Luis and Dr. Herbel did not have available the testimony of DEA agents, the pre-trial interview, the recorded MDC Guaynabo calls, or Mr. Gonzalez's testimony at the times of their initial forensic reports; Dr. Romey expressly discredits such evidence as not relevant to the clinical analysis of defendant's competency. Without considering that information, all experts overlooked the possibility that defendant Rivera sought to deceive his evaluators. As Dr. Daubon admitted, no medical personnel watches defendant Rivera twenty-four hours a day, (Docket No. 222 at p. 26), and according to Mr. Gonzalez, defendant Rivera knows it.

The Court refuses to limit the scope of its analysis to a mere review of clinicians' physical observations and interactions with defendant Rivera. That approach would allow defendant Rivera to pull the wool over its eyes. It therefore rejects Dr. Romey's approach and endorses Dr. Luis's and Dr. Herbel's view that the

evidence from the DEA agents and pre-trial services interviews, the
MDC telephone calls, and the testimony of Mr. Gonzalez all matter
in a thorough analysis of defendant Rivera's mental competency.
The Court agrees with Dr. Luis and Dr. Herbel that the numerous and
blatant inconsistencies contained in the evidence show that
defendant Rivera has been seeking to fool the clinicians and this
Court.  The evidence also demonstrates that defendant Rivera has
the mental capacity to understand the nature of the proceedings
against him and that he is capable of assisting his lawyer in his
defense.  Accordingly, defendant Rivera meets both prongs of the
competency test.

### 1.    Analysis of the Competency Test's First Prong

Under the first prong of the competency test,
defendant Rivera has shown that he understands the nature of the
legal proceedings against him.  Mr. Gonzalez, who shared a cell
with defendant Rivera in MDC Guaynabo for over a year,[14] testified
that defendant Rivera explained to him (1) why he was in jail—for
drugs, (2) why he was admitted to federal medical center facilities
in the United States—to have his mental status evaluated, and

---

[14] Mr. Gonzalez is a former Arecibo municipal police officer,
who, in exchange for his testimony, expected to receive a reduced
sentence for his guilty plea on the indictments of conspiracy to
possess with intent to distribute in excess of five kilograms of
cocaine, attempt to possess in excess of five kilograms of cocaine,
and possession of a weapon in furtherance of a drug trafficking
crime.  (Docket No. 339 at p. 23.)

(3) what sentence he would normally expect to receive for his actions—nine to eleven years.  He thus understands the charges against him and the legal process.  Defendant Rivera also demonstrated an understanding of the nature of the proceedings when he explicitly told Mr. Gonzalez that he was faking that he was not well in order to be at MDC the least time as possible.  Moreover, in order to avoid detection of their conversations regarding defendant Rivera's legal case, defendant Rivera and his family solicited the assistance of Mr. Gonzalez and Mr. Gonzalez's girlfriend.  They apparently sought to set up a secret system of communicating—not just about any subject, but rather specifically about defendant Rivera's case and competency hearings.

The Court views Mr. Gonzalez's testimony as evidence providing intimate insight into defendant Rivera's current level of mental sophistication.  It also finds illuminating defendant Rivera's own statements and conversations that were recorded over the telephone at MDC Guaynabo.

## 2.    Analysis of the Competency Test's Second Prong

The recorded telephone conversations shed light on defendant Rivera's ability to understand both the nature of the proceedings against him under the competency test's first prong and his ability to assist his attorney under the second prong. Defendant Rivera appears to understand that:  he has a female

attorney, (Docket No. 207 at Exhibit Nos. 8G, 16L, 17C, 17E, 17F); the attorney communicates with his family about when they will be able to see him at court, (Id. at Exhibit No. 8G); his mother meets with the lawyer, (Id. at Exhibit Nos. 16E, 17M); he can talk to his mother or his girlfriend about court hearings and his lawyer, (Id. at Exhibit Nos. 16L, 17A, 17C, 17E, 17G, 18I, 18H); and he can communicate his needs to his attorney by enlisting the help of his family members.  (Id. at Exhibit Nos. 17E, 17F.)

         Dr. Herbel and Dr. Luis also rely on the telephone calls to show defendant Rivera's awareness that his attorney functions as his advocate within the legal setting.  The calls also demonstrate defendant Rivera's mental capacity to direct people to take some action on his behalf regarding legal matters.  This, in turn, is indicative of his ability to assist his attorney in his defense under the competency test's second prong.[15]  The Court is persuaded by Dr. Luis' finding that defendant Rivera lacks any severe symptoms of a mental illness precluding defendant Rivera from assisting his attorney in the preparation of his defense.

_____

         [15] That defendant Rivera also conveys to his mother in the phone calls his unfamiliarity with the finer details of the legal process is insignificant.  The "understanding" required of a defendant "is of the essentials–for example, the charges, basic procedure, possible defenses–but not of legal sophistication.  One of the jobs of counsel–and, in limited respects, the judge–is to explain matters to the defendant, and that is that understanding that is required."  Robidoux, 643 F.3d at 339.

Dr. Luis believes, and the Court agrees, that were defendant Rivera motivated to do so, he has the capacity to assist toward his defense.

The Court acknowledges that defendant Rivera might suffer from some sort of mental illness, especially given his extended history of psychological treatments and evaluations, as testified to by Dr. Romey. "A person is not rendered incompetent [,however,] merely because he is mentally ill to some degree or is emotionally unstable. Rather, competency goes to the ability to participate effectively in one's own case." United States v. Horowitz, 360 F.Supp. 772, 777 (E.D.Pa.1973) (citations omitted); see also Swisher v. United States, 237 F.Supp. 921, 931 (W.D.Mo.1965), aff'd 354 F,2d 472 (highlighting that "mere proof of the fact that petitioner may have been in fact mentally ill at the time of trial does not establish that he was then mentally incompetent to stand trial"). Like Dr. Herbel, the Court does not believe that defendant Rivera is free of problems. His level of functioning here, however, appears to be high enough to understand the proceedings against him and to consult with his attorney. Accordingly, the Court finds by a preponderance of the evidence that defendant Rivera meets both prongs of the competency test pursuant to 18 U.S.C. § 4241.

## IV. CONCLUSION

Having considered the evidence presented throughout the dates during which defendant Rivera's extensive competency hearing was held, the Court concludes that defendant Rivera is not "presently [sic] suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," pursuant to 18 U.S.C. § 4241(d). Accordingly, the Court finds by a preponderance of the evidence that defendant Rivera is competent to stand trial.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, October 29, 2012.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE